*Swarna v. Al-Awadi*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

Docket Nos. 09-2525-cv (L); 09-3615-cv (XAP)

Argued: April 20, 2010                    Decided: September 24, 2010)

_____

VISHRANTHAMMA SWARNA,

*Plaintiff-Appellee-Cross-Appellant*,

- v.-

BADAR AL-AWADI, HALAL MUHAMMAD AL-SHAITAN,

*Defendants-Appellants*,

STATE OF KUWAIT,

*Defendant-Cross-Appellee.*

_____

Before:  MINER, CABRANES, and WESLEY, <u>Circuit Judges</u>.

Appeal from interlocutory orders entered on March 20, 2009, and May 29, 2009, and cross-appeal from a final judgment entered on July 24, 2009, pursuant to Federal Rule of Civil Procedure 54(b), in the United States District Court for the Southern District of New York (Castel, <u>J.</u>), granting plaintiff-appellee-cross-appellant's motion for default judgment against the defendants-appellants for various claims based on the Alien Tort Claims Act and New York labor laws, dismissing plaintiff's claims against defendant-cross-appellee the State of Kuwait on sovereign immunity grounds, and denying the plaintiff's and the defendants-appellants' motions for reconsideration, the court having determined that (1) defendants-appellants were not entitled to diplomatic immunity under the Vienna Convention on Diplomatic Relations; (2) defendant-appellee Kuwait was entitled to sovereign immunity under the Foreign Sovereign Immunity Act; and (3) entry of default judgment against defendants-appellants was warranted because their default was willful, they did not have a meritorious defense, and plaintiff would suffer considerable prejudice if a default judgment were denied.

Affirmed in part, vacated in part, and remanded.

ANDREW J. FIELDS, Main Street Legal Services, Inc., Flushing, New York; David A. Kotler, Dechert LLP, Princeton, New Jersey, Robert W. Topp, Dechert LLP, New York, New York, Amy L. Rudd, Dechert LLP, Austin, Texas, <u>for plaintiff-appellee-</u>

cross appellant Vishranthamma Swarna

NEIL H. KOSLOWE, Thomas B. Wilner, Justin L. Harrison, and Amanda R. Kosonen, Shearman & Sterling LLP, Washington, D.C., for defendants-appellants Badar Al-Awadi, Halal Muhammad Al-Shaitan, and the State of Kuwait.

Araceli Martinez-Olguin and Lenora M. Lapidus, American Civil Liberties Union Foundation Women's Rights Project, New York, New York; Ivy O. Suriyopas, Asian American Legal Defense and Education Fund, New York, New York, for amici curiae American Civil Liberties Union Foundation Women's Rights Project; Asian American Legal Defense and Education Fund; Andolan; Break the Chain Campaign; CASA de Maryland; DAMAYAN Migrant Workers Association; Domestic Workers United; Freedom Network; Klasko, Rulon, Stock & Seltzer, LLP; Legal Momentum; National Domestic Workers Alliance; New York Anti-Trafficking Network; and Safe Horizon.

Emily E. Daughtry and Sarah S. Normand, Assistant United States Attorneys (Preet Bharara, U.S. Attorney for the Southern District of New York); Douglas N. Letter and Robert M. Loeb, Appellate Staff, Civil Division, U.S. Department of Justice (Tony West, Assistant Attorney General, Civil Division, U.S. Department of Justice); Susan R. Benda, Attorney Advisor, U.S. Department of State (Harold Hongju Koh, Legal Adviser, U.S. Department of State), New York, New York, for amicus curiae United States of America.

MINER, Circuit Judge:

Defendants-appellants Badar Al-Awadi ("Al-Awadi") and his wife Halal Muhammad Al-Shaitan ("Al-Shaitan," or, together with Al-Awadi, the "individual defendants") appeal from interlocutory orders entered on March 20, 2009, and May 29, 2009, and plaintiff-appellee-cross-appellant Vishranthamma Swarna ("Swarna") cross-appeals from a final judgment entered on July 24, 2009, pursuant to Federal Rule of Civil Procedure 54(b), in the United States District Court for the Southern District of New York (Castel, J.). The District Court granted Swarna's motion for default judgment against the individual defendants for claims brought pursuant to the

Alien Tort Claims Act, 28 U.S.C. § 1350, alleging trafficking, involuntary servitude, forced labor, assault, and sexual abuse (the "ATCA claims"), and for claims brought pursuant to New York State law, alleging fraud, unjust enrichment, breach of contract, and failure to pay legally required wages (the "state law claims"). The District Court determined that the individual defendants' default was willful, that their defense of diplomatic immunity under the Vienna Convention on Diplomatic Relations [hereinafter "Vienna Convention"], Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972), was without merit, and that Swarna would suffer considerable prejudice if a default judgment were denied. The District Court dismissed Swarna's ATCA and state law claims against defendant-cross-appellee the State of Kuwait ("Kuwait") on sovereign-immunity grounds, pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (Oct. 21, 1976) (codified at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–11). The District Court denied both Swarna's and the individual defendants' subsequent motions for reconsideration, the court having adhered to the conclusions stated in its prior order granting Swarna's motion for default judgment as to the individual defendants and denying the same as to Kuwait. See Swarna v. Al-Awadi, 607 F. Supp. 2d 509 (S.D.N.Y. 2009).

I.    BACKGROUND

In 1995, Swarna's husband fell ill with heart problems. Having then become the sole source of income for herself, her husband, and their five children, Swarna left her native country of India to work in Kuwait. In Kuwait, a retired high-ranking police officer employed Swarna as one of five domestic workers in his home. Swarna had a "good relationship" with her employer and was satisfied with her arrangement in Kuwait.

Several months after beginning work in Kuwait, the employer's daughter, Al-Shaitan, and son-in-law, Al-Awadi, visited the home. At that time, Al-Awadi was Third Secretary to the Permanent Mission of the State of Kuwait to the United Nations in New York, New York. After observing Swarna interact with their two-year-old child, the individual defendants offered

3

Swarna a position in their New York home as a live-in domestic worker. Although Swarna initially declined, she ultimately accepted the offer after receiving various promises regarding her prospective employment. Among other things, the individual defendants promised to pay Swarna $2,000 per month; to provide Swarna an annual paid vacation to India to visit her family; and to allow her to take Sundays off to attend church. The individual defendants represented to Swarna that she would be treated well in the United States.

In order to secure Swarna's entry into the United States, Al-Awadi accompanied Swarna to the United States Embassy in Kuwait to apply for a G-5 visa authorizing her to work as a household employee of a diplomat. In the visa application, the individual defendants represented to the United States Embassy that they would compensate Swarna at the rate of $2,000 per month for her services in the United States and provide her with lawful conditions of employment. Swarna's salary would be paid for by the individual defendants; however, the individual defendants arranged for Kuwait to reimburse them for certain expenses for Swarna such as dental care. The visa was approved, and on September 8, 1996, Swarna arrived in New York.

Upon Swarna's arrival, the individual defendants confiscated Swarna's passport and visa, which were then kept in the Kuwait Mission. During her employment with the individual defendants, Swarna was paid only $200 to $300 per month — $1,700 to $1,800 less than the agreed compensation. Even that amount, moreover, was not directly paid to Swarna but instead sent to Swarna's family in India, thus leaving no funds of her own in the United States. Also contrary to their agreement, Swarna was prohibited from making the annual trip to India or attending church on Sundays.[1] According to the facts alleged in the complaint — described in further detail below — Swarna was by no means treated "well" in the United States. See Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 333 (2d Cir. 2009) ("[We] are constrained

---

[1] Swarna was eventually permitted to visit India two-and-a-half years after she arrived in the United States, at which point her husband was gravely ill. Before leaving for India, the individual defendants reminded Swarna of their family's influential positions and threatened her that if she did not return, "[n]o matter where you go in India, we will hunt you."

4

not only to accept the truth of the plaintiff's jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiff's favor." (quoting Brooklyn Legal Servs. Corp. v. Legal Servs. Corp., 462 F.3d 219, 226 (2d Cir. 2006))).

Swarna lived and worked in the individual defendants' home in New York City, located about a mile from the United Nations and the Kuwait Mission. She worked approximately seventeen hours a day, seven days a week. Her duties included caring for two young children, doing the laundry, ironing, cleaning the home, and cooking for the family. The individual defendants also provided entertainment at their home in honor of employees of the Kuwait Mission, and on these occasions Swarna cooked for and served these guests until late into the night. Swarna also taught domestic servants of other Kuwait Mission employees how to cook traditional Kuwaiti dishes, and she cooked for an official event held at the Kuwait Mission on "at least one occasion."

The individual defendants did not permit Swarna to leave the apartment without supervision, and even when she was so permitted — which occurred ten to fifteen times during the course of four years — she was instructed to look down at the ground and to avoid making eye contact with anyone. Swarna was usually locked inside the apartment, she was not permitted to use the telephone,[2] and she was prohibited from speaking to anybody outside of the individual defendants' family. To prevent Swarna from speaking with other people, she was confined to her room "[w]henever the handyman, electrician, or others visited the apartment during the day." The individual defendants also forbade Swarna from watching any English-language television as part of an effort to prevent her from learning English. They also intercepted calls from her family in India, read her mail, and read her letters before she could send them to her family. To this end, an official from the Kuwait Mission was arranged to translate Swarna's correspondence. On the

---

[2] An exception applied when the individual defendants would call: the individual defendants indicated to Swarna that they were calling "by letting the phone ring twice, then hanging up and calling back."

rare occasion that Swarna was permitted to call her children, the individual defendants listened to the call and deducted the cost of calling cards from Swarna's wages. Swarna did not receive many of the letters her family had sent her, and the individual defendants "failed to mail most of the letters [Swarna wrote] to her family."

The individual defendants repeatedly assaulted and abused Swarna, both physically and psychologically. For example, Swarna was threatened to have her tongue cut out and was dragged by her collar on several occasions. The individual defendants referred to Swarna as "dog" or "donkey," and forcibly cut her hair — which was "an important part of [Swarna's] identity and sense of self" — against her will. Swarna slept in the children's bedroom, she had no privacy and no place of quiet refuge, and she often cried herself to sleep.

By mid-1998, Swarna, who weighed 150 pounds before working for the individual defendants, weighed only 100 pounds and looked as if she was afflicted with tuberculosis. Swarna's diminished constitution prompted the individual defendants to order Swarna "to get a checkup for [tuberculosis]." Swarna's checkup, which occurred at her own expense, did not reveal any signs of tuberculosis. In September 1998, Al-Awadi raped Swarna. He threatened to kill her if she told anyone, particularly his wife Al-Shaitan. Al-Awadi thereafter raped Swarna "on many occasions," and Swarna "constantly feared that [Al-Awadi] would rape me at any time when Al-Shaitan was not at home."

These abusive conditions led Swarna to suffer hair loss, nightmares and fatigue, and caused her to contemplate suicide.

> When I was working in the Al-Awadi's kitchen, I could look out the window and see the view of what I now know to be the East River and the Citibank office tower in Queens. I often imagined escaping the Al-Awadi home so that I could jump in the river, drown myself, and end the misery of my life in the Al-Awadi home. It was only the enduring need of my sick husband and five children in India that kept me from doing so.

On or about June 25, 2000, the individual defendants and Swarna were preparing for a trip to Kuwait. Swarna begged to be sent back to India. Al-Awadi became angry, screamed at

Swarna, and threw a packed suitcase at her. This attack caused Swarna to bleed and left bruises on her body. Al-Awadi then threatened to hit Swarna with an iron rod. Al-Shaitan slapped Swarna across the face, and Al-Awadi warned Swarna that if she did not continue to work for him, she would be harmed during the family's trip to Kuwait, where his brother and father were "high ranking police officials."

The next morning, Swarna noticed that the individual defendants had left everyone's passports, including her own, on their bed in preparation for the trip to Kuwait. Swarna seized the opportunity to reclaim her passport, and taking with her only a Bible and photographs of her children, she fled the individual defendants' apartment. Swarna had no money and no place to go, so she sought aid from a passing taxicab driver. Swarna told the driver of her ordeal and was taken to a temple where she could find refuge.

A.      Procedural History

Swarna initially filed suit against the individual defendants on May 15, 2002. Without the individual defendants ever responding to Swarna's complaint, the District Court determined that it lacked subject matter jurisdiction because, at the time Al-Awadi was served, he was employed as a diplomat by the Kuwait Mission and therefore was entitled to diplomatic immunity. The court dismissed the case without prejudice because Swarna could plausibly institute a new action against the individual defendants — "if she can locate them" — after their association with the Kuwaiti Mission has terminated. See Summary Order, Swarna v. Al-Awadi, 02 Civ. 3710 (PKL) (MHD) (S.D.N.Y. Jan. 26, 2005) (adopting Report and Recommendation of Magistrate Judge Dolinger).

Swarna filed this action against the individual defendants and Kuwait on June 23, 2006. On December 30, 2006, Swarna served the summons and complaint on Kuwait through diplomatic channels. When service on the individual defendants under the Hague Convention failed, the District Court granted Swarna's motion to serve the individual defendants — who by now were in Paris, France — by alternative means pursuant to Federal Rule of Civil Procedure

7

4(f)(3). <u>Swarna v. Al-Awadi</u>, No. 06 Civ. 4880, 2007 WL 2815605 (S.D.N.Y. Sept. 20, 2007). The individual defendants were so served on September 21, 2007. None of the defendants answered the complaint.

On February 13, 2008, Swarna requested leave to file papers in support of a default judgment against Kuwait and the individual defendants. In response, the District Court directed Swarna to file a motion for default judgment no later than March 28, 2008. Swarna requested three extensions before filing her motion for default judgment on August 5, 2008. On August 8, 2008, Kuwait retained counsel to represent it and the individual defendants.

On August 12, 2008, Kuwait and the individual defendants filed a motion for an extension of time to respond to both the motion for default judgment and the complaint, as well as to challenge the court's jurisdiction and raise other defenses. Swarna only consented to the extension motion insofar as it requested time to respond to the motion for default judgment. On August 25, 2008, the District Court granted Kuwait and the individual defendants an extension of time to respond to the motion for default judgment but denied their other requests. On September 17, 2008, Kuwait and the individual defendants filed their opposition to Swarna's motion for default judgment.

B.      The District Court's Decisions

The District Court granted Swarna's motion for default judgment as to the individual defendants, "subject to an inquest solely on the issue of damages," in a memorandum and order issued on March 20, 2009. The court held that Swarna's claims against the individual defendants were not barred by immunity under the Vienna Convention. The court further held that the entry of default judgment against the individual defendants was warranted because they willfully failed to respond to Swarna's complaint and otherwise lacked a meritorious defense, and because a denial of default judgment would prejudice Swarna. The District Court denied Swarna's motion for default judgment against Kuwait as barred by the FSIA, and denied Swarna's implied request

8

for jurisdictional discovery.[3] Swarna, 607 F. Supp. 2d at 529, 522, 528–29, 525–26, 511.

Both Swarna and the individual defendants moved for reconsideration of the District Court's decision. Swarna argued that the court misapplied the FSIA and overlooked certain facts in determining that Kuwait was entitled to sovereign immunity. The individual defendants argued that the court erred in rejecting their diplomatic immunity defense and that even if they were not entitled to diplomatic immunity, a default judgment against them should not have been granted. The District Court rejected both parties' arguments in a May 29, 2009 memorandum and order adhering to the court's prior rulings. Swarna v. Al-Awadi, No. 06 Civ. 4880, 2009 WL 1562811 (S.D.N.Y. May 29, 2009).

On June 12, 2009, the individual defendants filed a notice of appeal from the District Court's March 20, 2009 order granting Swarna's default judgment against them, and from the District Court's May 29, 2009 order denying their motion for reconsideration. In light of the pending appeal, the District Court vacated its prior order scheduling a damages hearing. On July 22, 2009, the District Court granted Swarna's motion pursuant to Federal Rule of Civil Procedure 54(b), for entry of final judgment dismissing all claims against Kuwait. Swarna v. Al-Awadi, No. 06 Civ. 4880, 2009 WL 2190192 (S.D.N.Y. July 22, 2009). Swarna then filed a notice of appeal from the District Court's July 24, 2009 final judgment dismissing all claims against Kuwait.

On appeal, the individual defendants argue: (1) Swarna's claims are barred by diplomatic immunity because (a) Article 39 of the Vienna Convention provides residual diplomatic immunity for acts performed in the exercise of their functions as members of the Kuwait Mission, and (b) employment of domestic workers is protected activity under the Vienna Convention as part of a diplomat's mission-related function; and (2) the District Court abused its

---

[3] Swarna never formally moved for jurisdictional discovery; however, the District Court construed Swarna's memorandum of law in support of entering default judgment — which argued that a lower standard of proof for establishing jurisdiction over a foreign sovereign under the FSIA should be applied because "discovery against the foreign state has been frustrated by the state's own default" — as an application for jurisdictional discovery.

discretion in entering default judgment against them because (a) their default was not willful, (b) Swarna caused much of the delay and would not be prejudiced by the setting aside of the default judgment, (c) they have a meritorious defense of diplomatic immunity, and, alternatively, they contest Swarna's factual allegations, and (d) entry of default judgment was unwarranted in this case because the facts and history of the case did not support the entry of this "harsh" disposition of "last resort."

On cross-appeal, Swarna argues that (1) the District Court erred in dismissing her claims against Kuwait because her claims fall within the FSIA's tort and commercial exceptions to sovereign immunity; (2) the District Court abused its discretion in refusing to order limited jurisdictional discovery; and (3) Kuwait could be held liable for the actions of individual defendants "under the doctrine of respondeat superior" if this Court determines that individual defendants committed their alleged actions in their official roles. Pls.' Br. at 19 – 20.

## II.     DISCUSSION

### A.      Standard of Review

We review de novo a district court's interpretation of a treaty such as the Vienna Convention. See Blondin v. Dubois, 238 F.3d 153, 159 (2d Cir. 2001). In interpreting a treaty, it is well established that we "begin[] with the text of the treaty and the context in which the written words are used." Mora v. New York, 524 F.3d 183, 194 (2d Cir. 2008); accord Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 180 (1982) ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." (internal quotation marks omitted)). General rules of statutory construction "may be brought to bear on difficult or ambiguous passages," but we also "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the [signatory] parties" in determining the meaning of a treaty provision. E. Airlines, Inc. v. Floyd, 499 U.S. 530, 535 (1991); see also Medellin v. Texas, 552 U.S. 491, 507 (2008) ("Because a treaty ratified by the United States is an

10

agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations." (internal quotation marks omitted)). In addition, while the interpretation of a treaty is a question of law for the courts, given the nature of the document and the unique relationships it implicates, the "Executive Branch's interpretation of a treaty is entitled to great weight." See Abbott v. Abbott, 130 S. Ct. 1983, 1993 (2010) (internal quotation marks omitted).

We review for abuse of discretion a district court's grant of default judgment. D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 107 (2d Cir. 2006). A district court's decision regarding subject matter jurisdiction under the FSIA is reviewed for clear error as to factual findings and de novo as to legal conclusions. Robinson v. Gov't of Malaysia, 269 F.3d 133, 138 (2d Cir. 2001); see also Aurelius Capital Partners, LP v. Republic of Argentina, 584 F.3d 120, 129 (2d Cir. 2009).

B.     Residual Diplomatic Immunity

Under 22 U.S.C. § 254d, a district court must dismiss "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the [Vienna Convention]." This statutory dictate is consistent with the Vienna Convention itself, which provides that a "diplomatic agent shall enjoy immunity from the criminal . . . civil and administrative jurisdiction" of the receiving state. Vienna Convention art. 31(1) (emphasis added). Cf. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (sovereign immunity means immunity from jurisdiction). We note that the Supreme Court has specifically declined to rule on whether a related treaty, the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77 (entered into force in U.S. Dec. 13, 1972), is a self-executing treaty. See Medellin, 552 U.S. at 506 n.4 ("[Here] it is unnecessary to resolve whether the Vienna Convention is itself 'self-executing' . . . ."); see also id. (citing Sanchez-Llamas v. Oregon, 548 U.S. 331, 343 (2006) ("[F]or purposes of addressing petitioners' claims, we assume, without deciding, that [the Vienna Convention on Consular Relations] does grant [petitioners] asserted rights.")). Because Swarna

11

does not seek a remedy under the Vienna Convention, but instead seeks a remedy under state and federal law, we similarly need not determine whether the treaty is self-executing or whether the treaty provides "rights conferred directly upon individuals that are assertable, in a private action brought directly under the Convention itself or pursuant to [federal law]." Mora, 524 F.3d at 193.

Although diplomats enjoy broad immunity pursuant to the Vienna Convention from civil and criminal process, see Brzak v. United Nations, 597 F.3d 107, 113 (2d Cir. 2010), diplomats lose much of their immunity following the termination of their diplomatic status, Vienna Convention art. 39(2); see also Brzak, 597 F.3d at 113. Article 39(2) of the Vienna Convention states:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

Vienna Convention art. 39(2) (emphasis added).

Article 39(2) of the Vienna Convention thus provides for so-called "residual" immunity, which is a less expansive immunity that remains with the former diplomats for certain acts committed during their occupation of the diplomatic station. Specifically, once a diplomat becomes a "former" diplomat, he or she is not immune from suit for prior acts unless those acts were performed "in the exercise of [the former diplomat's] functions as a member of the mission." Vienna Convention art. 39(2).

Initially, we address whether Al-Shaitan, the wife of a diplomat, is entitled to residual diplomatic immunity under Article 39(2). She is not. Residual immunity applies only to a person who was "a member of the mission." See Vienna Convention art. 39(2). Al-Shaitan was accredited by Kuwait as Al-Awadi's spouse, but she was never a member of the Kuwait Mission. Thus, she "enjoys no residual immunity from the civil jurisdiction of the United States." Br. for the United States as Amicus Curiae, at 29 ("Al-Shaitan was never a member of the Kuwait

12

Mission. . . . Accordingly, Al-Shaitan could not have conducted any acts under Article 39(2) 'as a member of the mission.'"). To be sure, "members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities [of the diplomatic agent] specified in articles 29 to 36." Vienna Convention art. 37(1). But residual immunity is contained in Article 39, which, in turn, specifically limits its application to "member[s] of the mission." Vienna Convention art. 39(2). In short, while Al-Shaitan enjoys the same scope of immunity as her diplomat-husband while he is a member of the mission, once the husband's tenure as diplomat has expired, such derivative immunity "normally cease[s] at the moment when [s]he leaves [the United States], or on expiry of a reasonable period in which to do so." Vienna Convention art. 39(2).

With respect to Al-Awadi, it is undisputed that he was a "member of the [Kuwait] mission," and so our inquiry turns to whether Al-Awadi's employment and treatment of Swarna were "acts performed . . . in the exercise of his functions as a member of the mission." Vienna Convention art. 39(2). To this end, we find it significant that Article 39(2) does not immunize acts that are "incidental to" the exercise of his functions as a member of the mission. Residual immunity, as consistent with the Vienna Convention's purpose of "not . . . benefit[ting] individuals but . . . ensur[ing] the efficient performance of the functions of diplomatic missions," Vienna Convention pmbl, cl. 4, is limited to a narrow set of acts that are committed "in the exercise of his functions as a member of the mission," Vienna Convention art. 39(2) (emphasis added). "[M]odern international law has adopted diplomatic immunity under a theory of functional necessity." 767 Third Ave. Assocs. v. Permanent Mission of the Republic of Zaire, 988 F.2d 295, 300 (2d Cir. 1993). Accordingly, a diplomat enjoys broad personal immunity from civil and criminal jurisdiction while performing the functions of a member of a diplomatic mission. See Vienna Convention art. 31. This immunity exists "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." Vienna Convention pmbl. cl. 4. For this reason, while *residual* diplomatic immunity applies to

13

the "acts performed by such a person in the exercise of his functions as a member of the mission," Vienna Convention art. 39(2), it does not apply to actions that pertain to his household or personal life and that may provide, at best, "an indirect" rather than a "direct . . . benefit to" diplomatic functions. Park v. Shin, 313 F.3d 1138, 1142 (9th Cir. 2002) (defining the concept of residual consular immunity under the Vienna Convention on Consular Relations). Although Al-Awadi asserts at one point that residual immunity encompasses all acts that are incidental and indispensable to diplomatic activities, acts incidental and indispensable to diplomatic activities include, in this context, only such acts as are directly imputable to the state or inextricably tied to a diplomat's professional activities.

This conclusion is supported by the Vienna Convention's drafting history. The Vienna Convention grew out of the work of the International Law Commission which was tasked with "undertak[ing] the codification of the topic of '[d]iplomatic intercourse and immunities,' [in light of] existing principles and rules and recognized practice." G.A. Res. 685 (VII), ¶ ¶ 2, 5 (Dec. 5, 1952), available at http://www.un.org/documents/ga/res/7/ares7.htm; see also 767 Third Ave Assocs., 988 F.2d at 300 (noting that the Vienna Convention "codified longstanding principles of customary international law with respect to diplomatic relations"); Finzer v. Barry, 798 F.2d 1450, 1458 (D.C. Cir. 1986) ("'[T]he 1961 Vienna Conference examined the articles in the light of modern conditions, surveying the body of law and practice which had developed over the years regarding the rights, duties, and privileges of diplomatic missions . . . .'" (quoting Leonard Meeker, Legal Adviser of the Dep't of State, Hearing on the Vienna Convention on Diplomatic Relations Before the Subcomm. of the S. Comm. on Foreign Relations, 89th Cong. at 2 (1965))).

The draft version of Article 39(2) was written by the International Law Commission's Special Rapporteur, A.E.F. Sandström. See [1955] II INT'L L. COMMISSION Y.B. 9–17. According to the 1957 Report of the International Law Commission, "[u]nder the first sentence of paragraph 2 it appeared that all members of diplomatic missions, including diplomatic staff proper, would lose all immunity in respect of acts that had not been performed in exercise of

14

their functions as soon as such functions came to an end." [1957] I INT'L L. COMMISSION Y.B. 142, ¶ 34. One delegate asked the Special Rapporteur whether he would agree to "replace the words 'in the exercise of his functions' by 'during the exercise of his functions.'" Id. ¶ 35. In response, the Special Rapporteur explained that "in his view, immunity should subsist only in respect of acts performed in the exercise of diplomatic functions." Id. ¶ 38; accord RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 464 n.10 (1987) ("Immunity from legal process with respect to the agent's official acts continues indefinitely even after the termination of the agent's diplomatic status."); SATOW'S DIPLOMATIC PRACTICE 131 (Desmond Pakenham, ed., 5th rev. ed. 1979) ("The immunity of a diplomatic agent for his official acts—acts performed in the exercise of his functions as a member of the mission—is on the other hand unlimited in time. Immunity in regard to such acts is not a personal immunity of the diplomatic agent but is in reality the immunity of the sending sovereign state.")

Consistent with the text and drafting history of Article 39(2), the United States, through the Department of State, has limited the application of residual immunity to "official acts only." Br. for the United States as Amicus Curiae at 11. We note that "[i]t is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" Abbott, 130 S.Ct. at 1993 (quoting Sumitomo, 457 U.S. at 184–85 n.10). In fact, more than twenty years ago, the Legal Adviser of the Department of State explained the practices of the United States with respect to diplomatic immunity and declared that only "official acts" and "official functions" were protected under Article 39(2)'s provision for residual immunity. See Declaration of Abraham D. Sofaer 3–7 (July 5, 1988), reprinted in Br. for the United States as Amicus Curiae, add. 3–7.

The Legal Adviser further observed, at the time, that the United States' interpretation of Article 39(2) was "consistent with [the] practice of other sovereign states, including the almost

15

150 states which are party to the Vienna Convention."[4] Id. at 8, reprinted in Br. for the United States as Amicus Curiae, at add. 8; see also Abbott, 130 S. Ct. at 1993 ("In interpreting any treaty, the opinions of our sister signatories are entitled to considerable weight." (internal quotation marks, ellipsis, and alteration omitted)); cf. Regina v. Bow Street Metro. Stipendiary Magistrate Ex Parte Pinochet Ugarte (No.3), 1999 WL 250052, [2000] 1 A.C. 147, 202 (House of Lords Mar. 24, 1999) ("[U]nder article 39(2) the ambassador, like any other official of the state, enjoys immunity in relation to his official acts done while he was an official."); Zoernsch v. Waldock, [1964] EWCA (Civ), 2 All E.R. 256 (U.K.) ("The English cases show that in English law an envoy's immunity from suit and legal process in respect of acts done in his private capacity endures only so long as he is en poste . . . . Quite different considerations, however, apply to acts done by him in his official capacity."). Article 31 establishes that the "diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State" and "from its civil and administrative jurisdiction" except in three cases—none of which are relevant here. Article 32(9), on residual immunity, does not distinguish between civil or criminal jurisdiction. In light of a long history of granting broad jurisdictional immunity to former diplomats who acted *in their official capacities*, and a "well established canon of deference" with regard to Executive Branch interpretation of treaties, Abbott, 130 S.Ct. at 1993, it seems to us appropriate to apply the Legal Adviser's declaration regarding criminal acts to civil acts as well, in accordance with the advice of the United States in its *amicus* brief.

In his attempt to broaden the scope of residual immunity to encompass not only official acts but all acts that are peripheral to official acts, Al-Awadi relies on a textual distinction in the Vienna Convention. He asserts that two provisions of the Vienna Convention, Articles 31 and 38, specifically refer to "official functions" and "official acts" in describing certain elements of immunity of a sitting diplomat. See Vienna Convention arts. 31(1)(c), 38(1). By contrast, he

_____

[4] Kuwait's broad interpretation of Article 39(2)'s provision on residual immunity, therefore, is not only inconsistent with the United States' interpretation of residual immunity, but also appears to be a distinctly minority view.

16

asserts that Article 39 does not refer to "official functions" or "official acts" but, as noted above, extends residual immunity to those acts performed "in the exercise of his functions as a member of the mission." Vienna Convention art. 39(2); cf. Vienna Convention art. 31(1)(c) (exempting from immunity a diplomat's commercial activities that are "outside his official functions"); Vienna Convention art. 38 (immunity applicable to "official acts" in cases where a diplomat is also a national of the receiving state). This difference must be accounted for, according to Al-Awadi, by giving the "in the exercise of" language in Article 39(2) a substantially broader meaning than the "official functions" and "official acts" language of Articles 31 and 38.

But Articles 31 and 38 apply to the service of sitting diplomats and thus implicate different policy considerations than Article 39, which applies to the service of former diplomats. Sitting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government. See Brzak, 597 F.3d at 113 ("International law provides extensive protection for diplomatic envoys . . . . Although current diplomatic envoys enjoy absolute immunity from civil and criminal process . . . former diplomatic envoys retain immunity only 'with respect to acts performed by such a person in the exercise of his function' as a diplomatic envoy." (quoting Vienna Convention art. 31)); cf. Tachiona v. United States, 386 F.3d 205, 215 (2d Cir. 2004) ("The Vienna Convention, which governs the privileges and immunities that are extended to diplomatic envoys . . . [w]ith *limited exceptions* . . . broadly immunizes diplomatic representatives from the civil jurisdiction of the United States courts." (emphasis added)). Once the diplomat's service for his or her government has expired, any threat of diplomatic interference is presumably minimized, and Article 39 accordingly directs that the "privileges and immunities shall normally cease." Vienna Convention art. 39(2). Articles 31 and 38 are, therefore, different provisions that implicate different considerations than Article 39. Thus, the textual distinction between Article 39 and Articles 31 and 38 does not compel the conclusion that the language of Article 39 ("in the exercise of his functions as a member of the mission") is broader than Article 31 and 38's "official acts" and "official functions" language so

17

as to cover Swarna's employment and alleged treatment.  Cf. United States ex rel. Chicago, N.Y. & Boston Refrigerator Co. v. Interstate Commerce Comm'n, 265 U.S. 292, 295 (1924) ("It is quite true that because words used in one statute have a particular meaning they do not necessarily denote an identical meaning when used in another and different statute.").  More importantly, accepting Al-Awadi's argument would result in an interpretation of Article 39(2) that is contrary to the drafting history of Article 39 and the practice of the United States as well as other foreign states.

Having determined that Article 39(2) is limited to official acts, we now consider whether Al-Awadi's employment and treatment of Swarna constituted official acts.  In conducting this analysis, we must not judge "whether the underlying conduct actually occurred, or whether it was wrongful."  Brzak, 597 F.3d at 113.  Rather, our consideration is a functional one, which "parallels the objective tests we have adopted in applying other forms of immunity."  Id. & n.** ("In applying th[e] functional test, we . . . look[] to the objective acts . . . in question, not to the type of injury alleged.").  Thus, for example, in Brzak we held that U.N. officials qualified for residual immunity under the Vienna Convention against alleged acts of sex discrimination, retaliation, the intentional infliction of emotional distress, and acts constituting a violation under the Racketeer Influence and Corrupt Organizations Act, all of which occurred in the course of the U.N. officials' management of their office.  Id. at 113.  We concluded that these allegations, as they were articulated by the plaintiffs in Brzak, involved "personnel management decisions falling within the ambit of the [U.N. officials'] professional responsibility."  Id.

Al-Awadi argues that Swarna was "employed . . . to assist [him] in the exercise of [his] mission-related functions," and, therefore, all acts arising from that employment relationship are immune from suit under the Vienna Convention's provision for residual immunity.  Ultimately, however, Al-Awadi's argument must be rejected, as it assumes a fact that is not supported by the record.  The alleged facts clearly show that Swarna was employed to meet Al-Awadi's and his family's private needs and not any mission-related functions.  Swarna worked an average of

18

seventeen hours a day, seven days a week, cooking, cleaning, caring for Al-Awadi's children, and tending to the family's personal needs. Al-Awadi also allegedly raped Swarna. If Swarna's work for the family may not be considered part of any mission-related functions, surely enduring rape would not be part of those functions either. Although Swarna also cooked and served guests at official functions from time to time and taught other servants how to cook Kuwaiti dishes, these duties were incidental to her regular employment as Al-Awadi's personal servant. Cf. Park, 313 F.3d at 1143 (determining that supervision and management of a domestic servant who was required to cook, clean, care for the children, and otherwise tend to the diplomat's personal affairs, but also required to assist in entertaining official guests at the diplomat's home were not "consular functions" within the meaning of the Vienna Convention on Consular Relations art 43(1): "Plaintiff was hired as the [diplomat's] personal domestic servant. Any labor that she performed on behalf of the Consulate was incidental to her employment as a personal servant.").

Moreover, the facts that Swarna was paid out of Al-Awadi's private funds and that she received a G-5 visa further indicate that she was employed by Al-Awadi and not by the Kuwait Mission. In the application for Swarna's visa, the individual defendants represented to the United States that *they* would pay Swarna's salary. Only some of her expenses (such as dental care) were covered by the mission. Recipients of the G-5 visa are "aliens employed in a domestic or personal capacity by a principal alien, who are paid from the private funds of the principal alien and seek to enter the United States solely for the purpose of such employment." 22 C.F.R. § 42.21(a)(4). Had Swarna been an employee of the Kuwait Mission, she would have been issued a G-2 visa. See 8 U.S.C. § 1101(a)(15)(G)(ii) (listing nonimmigrant visa for "other accredited representatives of such a foreign government"); 8 C.F.R. § 214.2(g) ("The determination by a consular officer prior to admission and the recognition by the Secretary of State subsequent to admission is evidence of the proper classification of a nonimmigrant . . . ."). Swarna's nonimmigrant status reflected precisely her occupation in the United States: a personal servant hired to meet the individual defendants' private needs.

19

Al-Awadi relies on Tabion v. Mufti, 73 F.3d 535, 538–39 (4th Cir. 1996), a case in which the Fourth Circuit stated that "[d]ay-to-day living services such as dry cleaning or domestic help were not meant to be treated as outside a diplomat's official functions . . . [b]ecause these services are incidental to daily life." But that statement was made in the context of considering whether a sitting diplomat's hiring of a domestic servant fell within the "commercial activity" exception to diplomatic immunity under Article 31(1)(c). Under Article 31(1), a diplomat enjoys absolute immunity save for three exceptions in civil cases, one of which is for an "action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Vienna Convention art. 31(1)(c). The Tabion court agreed with the U.S. Department of State that the term "commercial activity" in Article 31(1)(c), as modified by its latter phrase "outside his official functions," "focuses on the pursuit of trade or business activity; it does not encompass contractual relationship for goods and services incidental to the daily life of the diplomat and family in the receiving State." Tabion, 73 F.3d at 538 (internal quotation marks omitted). Thus, Tabion articulates the scope of acts as they relate to the term "commercial activity" under Article 31(1)(c) for sitting diplomats; Tabion does not define "official functions," much less define the official acts that are accorded perpetual immunity under Article 39(2) to former diplomats.

Al-Awadi also cites to three foreign cases, which he explains applied residual immunity to (1) an Austrian Ambassador who accidentally shot and killed the French Ambassador during a hunting expedition, which was arranged by the President of Yugoslavia to further good relations between the countries, Heirs of Pierre S v. Austria, Case No. 1 Ob 49/81, 86 ILR 546 (1982); (2) a Portugese diplomat who ordered a translation on behalf of Portugal, Portugal v. Gonclaves, 82 ILR 115 (1982); and (3) a detective on the diplomatic staff of the Australian High Commission who sent certain evidence to Australian law enforcement in violation of the laws of England, Propend Fin. Pty Ltd. v. Sing, 111 ILR 611 (1997). See Appellant's Opening Br. at 23–27. These cases, however, are distinguishable in numerous ways, the most obvious being that the

20

actors in these cases were employees of the state (Swarna was paid by the individual defendants, not Kuwait) and were involved in activities that were clearly associated with the functions of the diplomatic mission.[5]

Finally, so far as "private servant[s]" are explicitly referred to in Vienna Convention Article 1(h) (defining "private servant"),[6] these references are insufficient to support the contention that the employment of private servants is necessarily an official act and that any conduct taken against them automatically is protected by residual immunity. Moreover, assuming arguendo that Swarna's employment constituted an official act, it does not follow that Al-Awadi is accorded immunity for any and all acts committed against her. For example, while Al-Awadi could claim diplomatic immunity for common crimes directed at Swarna while he was serving as a member of the mission, he could not commit these crimes and claim residual immunity merely because his initial hiring of Swarna constituted an official act. Only if the commission of such crimes could be considered an official act would residual immunity apply. Cf. Brzak, 597 F.3d at 114 (leaving open the question of whether a U.N. official's alleged

---

[5] Article 3 of the Vienna Convention provides that the functions of a diplomatic mission consist of, inter alia:

(a) Representing the sending State in the receiving State;

(b) Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) Negotiating with the Government of the receiving State;

(d) Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

[6] These references appear at Article 10(1)(c)–(d) (notification procedures for private servants and particular requirements for certain private servants); Article 33(2) (exempting certain private servants from social security provisions of the receiving state); Article 37(4) (exempting certain private servants from dues and taxes from the receiving state); and Article 38(2) (providing certain private servants privileges and immunities "only to the extent admitted by the receiving State").

21

commission of the tort of battery against a U.N. employee constituted activity outside the scope of residual immunity). Accordingly, we reject Al-Awadi's argument that Swarna's employment and his treatment of her were included within his official acts as a diplomat. Residual immunity, therefore, is no barrier to Swarna's claims against the individual defendants.[7]

C. Entry of Default

1. Appealability

In this case, we are confronted with an appeal by the individual defendants of an order directing entry of a default judgment. In general, a default judgment, like any other judgment, can be appealed to this Court. See, e.g., Pecarsky v. Galaxiworld.com Ltd., 249 F.3d 167, 170–71 (2d Cir. 2001) ("[D]efault judgment is a final disposition of the case and an appealable order." (internal quotation marks omitted)). Here, however, the District Court's entry of default judgment was conditional and therefore should more appropriately be understood as an entry of default. See Fed. R. Civ. P. 55(a) (entry of default);[8] Fed. R. Civ. P. 55(b)(2) (entry of default judgment by a district court).[9]

In its memorandum and order of March 19, 2009, the District Court entered its order of default judgment. At that time, however, the court expressly left unresolved the issue of the

---

[7] As the District Court noted, the individual defendants have not argued that Swarna's allegations fail to state claims for relief and to invoke federal jurisdiction under the ATCA. For purposes of the individual defendants' appeal, which arises from the denial of immunity, we need not examine Swarna's ATCA claims.

[8] Rule 55(a) provides, in relevant part: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

[9] Rule 55(b)(2) provides, in relevant part: "[T]he party [seeking affirmative relief] must apply to the court for a default judgment. . . . If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

proper amount of damages. See Swarna, 607 F. Supp. 2d at 529 ("For the foregoing reasons, [Swarna's] motion for a default judgment . . . is granted, subject to an inquest solely on the issue of damages, which will be scheduled by the [c]ourt."). See Fed. R. Civ. P. 55(b)(2)(B). Because the inquest on damages was pending, the District Court's order, though styled a default judgment, was a non-final order. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 11 (2d Cir. 1993) ("[D]efault judgment cannot be entered until the amount of damages has been ascertained."); Dow Chem. Pac. Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 336 (2d Cir. 1986) (concluding that default judgment was "in fact no more than another interlocutory entry of default" because the district court "expressly ordered [in its default judgment] that there be an inquest as to damages and indicated that only thereafter would a final judgment be entered").

Although the entry of a default judgment conditional on an inquest on damages is an interlocutory act and therefore not ordinarily appealable, we conclude that we have jurisdiction to consider an appeal from the order of March 19, 2009 for two reasons. First, we undoubtedly have jurisdiction to review the District Court's interpretation of the Vienna Convention's provision on residual immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (recognizing jurisdiction to review a "purely legal question on which . . . [a] claim of immunity turns"); Walcyzk, 496 F.3d at 153 ("An exception [to the final judgment rule] obtains . . . when the denied motion was based on a claim of immunity, at least to the extent the immunity claim presents a purely legal question.").

Second, we may review a non-final order if it is "inextricably intertwined" with or otherwise "necessary to ensure meaningful review" of an appealable order. Toussie v. Powell, 323 F.3d 178, 184 (2d Cir. 2003). We have stated that a non-final order is inextricably intertwined with an appealable order if there is "substantial factual overlap on the issues raised," id. (internal quotation marks omitted), but we have also relied upon legal overlap in analyzing whether the non-final order is extricably intertwined with an appealable order, see, e.g., Clubside, Inc. v. Valentin, 468 F.3d 144, 161 (2d Cir. 2006) (Sotomayor, J.) (finding the issues to be

23

inextricably intertwined because determination of appealable legal issue directly affects disposition of the non-appealable legal issue). Here, the appealable issue of residual immunity under the Vienna Convention is inextricably intertwined with the non-final order of default judgment entered against the individual defendants. The individual defendants are entitled to appeal the non-final order based on their claim of immunity from suit under the Vienna Convention.

We note, as well, that the question of whether the individual defendants are protected by residual diplomatic immunity must be answered before the entry of a default judgment; if the individual defendants were indeed protected by residual immunity, the District Court would have lacked jurisdiction to enter a default, much less a default judgment. Cf. Tachiona, 386 F.3d at 223 (explaining that the concept of "inviolability" in the Vienna Convention precludes service of process on persons entitled to diplomatic immunity); see also Dennis, Garberg & Assocs. v. Pack-Tech Int'l Corp., 115 F.2d 767, 772 (10th Cir. 1997) ("[A] district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case."); First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda Permanent Mission, 877 F.2d 189, 196 (2d Cir. 1989) ("A decision that a default judgment is void for want of jurisdiction must be accompanied by dismissal of the action."). While we ultimately conclude that the individual defendants are not entitled to residual immunity in this case, the intertwined issues involving the Court's subject matter jurisdiction permit us to review the several issues raised in this appeal. Finally, in addition to the factual and legal overlap, this appeal does not present a situation where "one party . . . appeal[s] a flimsy collateral issue with the intention of obtaining interlocutory review for other issues it presses." Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 757 (2d Cir. 1998). Here, the District Court entered its default judgment against the individual defendants and left unresolved only the amount of damages to be awarded to Swarna. The District Court, however, then vacated its order scheduling a damages hearing. Indeed, the court's vacatur of the damages hearing came after the

24

individual defendants filed their notice of appeal. Cf. Kamerman v. Steinberg, 891 F.2d 424, 429 (2d Cir. 1989) (finding that "highly unusual circumstances," such as where the district court indisputably intended final judgment to be entered, overcame the "strong presumption against appealability [of non-final orders]" (internal quotation marks omitted)). While there is no final default judgment entered in this case, there are also no further proceedings pending in the District Court. In short, we see no danger in this case of the individual defendants having "parlay[ed] [appealable] collateral orders into multi-issue interlocutory appeal tickets." Rein, 162 F.3d at 757 (internal quotation marks omitted).

Accordingly, in view of the substantial overlap between the appealable issue of residual immunity and the non-final order of default, as well as considering the unique procedural posture of this case, we assume jurisdiction over the non-final order entering default judgment.

2.      Merits

The individual defendants argue that the District Court abused its discretion in entering a default judgment against them and then adhering to that determination on reconsideration. In considering whether to relieve a party of a default, a district court must consider three factors: (1) whether the default was willful; (2) whether setting the default aside would prejudice the adversary; and (3) whether a meritorious defense is presented. Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 243 (2d Cir. 1994). In determining willfulness, we have required the district court to find "more than mere negligence" on the part of the defendant in defaulting, Am. Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996); as to prejudice, the district court must consider the effect of the delay caused by the defendant's default, such as thwarting "plaintiff's recovery or remedy . . . , result[ing] in the loss of evidence, creat[ing] increased difficulties of discovery, or provid[ing] greater opportunity for fraud and collusion," 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2699, at 169 (3d ed. 1998); accord Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508,

25

515 (2d Cir. 2001); and as to the presence of a meritorious defense, the defendant "must present evidence of facts that, if proven at trial, would constitute a complete defense," SEC v. McNulty, 137 F.3d 732, 740 (2d Cir. 1998) (internal quotation marks omitted).

With respect to "willfulness," the District Court concluded that the individual defendants' default was egregious and deliberate because (1) they were aware of Swarna's claims as early as 2002, when she filed her first action against them; (2) that first action was dismissed without prejudice, and, thus, the individual defendants knew that the action could be instituted again; (3) the individual defendants were served and thus were aware of the instant action by September 2007; and (4) the individual defendants, through their counsel, "appeared in this action to file a memorandum opposing the entry of a default judgment, but not to answer the complaint." Swarna, 607 F. Supp. 2d at 528. We do not find the District Court's reasoning persuasive. Willfulness in this context "requires something more than mere negligence, such as egregious or deliberate conduct." New York v. Green, 420 F.3d 99, 108 (2d Cir. 1995). A default is not willful when it was caused by "a mistake made in good faith." Enron, 10 F.3d 57, 61 (2d Cir. 1996). Here, defendants' default was based on a mistaken belief that they need not answer the complaint. Swarna's first suit, alleging essentially the same claims as those alleged in this suit, was dismissed on grounds of diplomatic immunity without defendants needing to appear. Defendants argue that they therefore believed that the second suit would also be dismissed without any action on their part. Furthermore, one day after receiving Swarna's motion for default judgment, defendants retained counsel. One week later, counsel moved for an extension of time so that defendants could respond to Swarna's complaint. This conduct suggests that defendants' default was not willful but instead based on mistaken belief.

The District Court's prejudice analysis properly considered delay, noting that Swarna "suffered harm at the hands of the Individual Defendants between 1996 and 2000"; that she commenced her first action in 2002; that she filed the instant action in 2006; and that it took Swarna until 2007 to serve the individual defendants. Swarna, 607 F. Supp. 2d at 529. But there

26

is no explanation—and it is not obvious from the record—as to how the delay would prejudice Swarna's claims by affecting her recovery or providing the individual defendants a greater opportunity for fraud and collusion.[10] Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983) ("[D]elay alone is not a sufficient basis for establishing prejudice.").  Indeed, in order to prevail on the prejudice prong a plaintiff must show "that delay will result in the loss of evidence . . . or provide greater opportunity for fraud and collusion." Id. (internal quotation marks omitted).  We do not find, therefore, that setting the default judgment aside would prejudice Swarna.

Having found that the entry of default judgment failed on both the wilfulness and prejudice prongs of the factors considered in determining whether to open a default judgment, we need not address the "meritorious defense" prong to find that default judgment was improperly granted by the District Court.

D.      Cross Appeal: Sovereign Immunity

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Robinson, 269 F.3d at 138 (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (internal quotation marks omitted)).  "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception [to the FSIA] applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia, 507 U.S. at 355.  Once the defendant presents prima facie evidence that it is a foreign sovereign, the burden falls on the plaintiff to establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign. Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 241 (2d Cir. 2002).  Where the plaintiff satisfies her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of

_____

[10] The court also found that "the individual Defendants have not given any indication that they plan to defend this action." Swarna, 607 F. Supp. 2d at 529.  The court withdrew this erroneous finding, however, in its subsequent denial of reconsideration. Swarna, 2009 WL 1562811, at *7.

persuasion that the FSIA exception does not apply. Id. Of the several exceptions that are articulated in the FSIA, the applicability of two are in contention in this appeal: (1) the "tortious activity" exception and (2) the "commercial activity" exception. In view of the clear inapplicability of these exceptions in this case as explained below, we reject Swarna's challenge that the District Court's denial of her implied request for jurisdictional discovery was an abuse of discretion.[11] See In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 79 (2d Cir. 2008) (reviewing for abuse of discretion a district court's decision to deny jurisdictional discovery).

###### 1.    FSIA Tortious Activity Exception

The tortious activity exception permits courts to exercise jurisdiction over foreign sovereigns where the plaintiff seeks money damages "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of [the] foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5) (emphasis added); see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989) (stating that the tortious activity exception is limited "to those cases in which the damage to or loss of property occurs in the United States" (emphasis omitted)). In determining whether an alleged action is a tort, we have applied the law of the state in which the locus of injury occurred — here, New York law.[12] See Robinson, 269 F.3d at 142 & n.11.

---

[11] Insofar as Swarna invokes the ATCA as a separate basis for jurisdiction over Kuwait, this argument is foreclosed by the Supreme Court's decision in Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 438 (1989) ("We think that Congress' decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA . . . preclude[s] a construction of the Alien Tort Statute that permits the instant suit. . . . [T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.").

[12] Swarna fails to provide sufficient evidence of state practice and opinio juris to persuade us that a rule of customary international law has been violated by Kuwait in this case. See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 116 (2d Cir. 2008) ("[T]he law of nations has become synonymous with the term 'customary international law,' which describes the body of rules that nations in the international community 'universally abide by, or accede to, out of a sense of legal obligation and mutual concern.'") (internal citations omitted).

28

Under New York law, although an employee's tortious acts are imputable to the employer if "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions," Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (internal quotation marks omitted), an employer "is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business," Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Thus, for example, New York courts have rejected respondeat superior claims that a church was liable for its priest's sexual assault of a child, Paul J.H. v. Lum, 736 N.Y.S.2d 561, 562 (App. Div. 2002), that a hospital was liable for its attendant's sexual assault on a patient, N.X. v. Cabrini Medical Cent., 97 N.Y. 2d 247, 251 (2002); see also Cornell v. New York, 401 N.Y.S.2d 107, 108 (App. Div. 1977), that a school was liable for its volunteer-teacher's molestation of a student, Koran I. v. N.Y.C. Bd. of Educ., 683 N.Y.S.2d 228, 229–30 (App. Div. 1998), and that a mall was liable for its security guard's rape of a girl in the mall security office, Heindel v. Bowery Savings Bank, 525 N.Y.S.2d 428, 428–29 (App. Div. 1988). "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." Ross v. Mitsui Fudosan, Inc., 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

Swarna argues that Kuwait is not entitled to sovereign immunity under the FSIA because the individual defendants were acting within the scope of their employment as diplomats for Kuwait when they subjected her to "slavery and slavery-like practices, including forced labor, involuntary servitude, and sexual slavery." But, as the District Court found, rape and other inhumane acts allegedly committed by the individual defendants are not related to the furtherance of Kuwait's purposes in the United States. Swarna's claim of forced labor is based on services she provided to the individual defendants to meet their private needs. Also, it is beyond question that Al-Awadi did not rape Swarna to further Kuwait's purposes in the United States. Swarna's

29

ATCA claims "arise from personal motives" and are outside the diplomats' scope of employment with Kuwait. Thus, we reject Swarna's attempt at piercing Kuwait's sovereign immunity through the alleged tortious conduct of Kuwait's diplomats.

To the extent Swarna suggests that Kuwait committed a tort because "[a]n official at the Kuwait Mission opened and translated Swarna's correspondence with her family on behalf of the Individual Defendants"; "Swarna's passport was held by the Kuwait Mission for the duration of her employment"; employees of the Kuwait Mission "periodically provided an escort for Swarna when she was permitted to leave the Individual Defendants' home . . . reinforc[ing] the . . . restriction on Swarna's interaction with outsiders"; and Kuwait failed to "monitor its diplomats to ensure that they were complying with the laws and regulations of the United States," these acts either do not plausibly constitute an imputable tort or are "discretionary functions" which are accorded sovereign immunity under the FSIA. See 28 U.S.C. § 1605(a)(5)(A).

The tortious activity exception remains inapplicable if the tort is "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." Id. The language of this "discretionary function" rule is closely replicated in the Federal Tort Claims Act ("FTCA"), and therefore we consider the jurisprudence of other Courts of Appeals in considering FTCA case law when interpreting the FSIA's discretionary function provision. See Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 345–46 (1976) (provisions that are in pari materia must be construed together), superseded by statute on other grounds by 28 U.S.C. § 1447; see also, e.g., Doe v. Holy See, 557 F.3d 1066, 1083 (9th Cir. 2009) (per curiam) ("The language of the discretionary function exclusion closely parallels the language of a similar exclusion in the [FTCA], so we look to case law on the FTCA when interpreting the FSIA's discretionary function exclusion."); O'Bryan v. Holy See, 556 F.3d 361, 383–84 (6th Cir. 2009) ("[N]ot only does the language of the FSIA discretionary function exception replicate that of the [FTCA], 28 U.S.C. § 2680(a), but the legislative history of the FSIA, in explaining section 1605(a)(5)(A), directs us to the FTCA." (internal quotation marks

30

omitted; second alteration in original)).

In the context of the FTCA, the Supreme Court has broadly outlined the contours of "discretionary function" as (1) determined by the nature of the conduct rather than the status of the actor and (2) "plainly . . . encompass[ing] the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813–14 (1984). According to the Supreme Court, the discretionary function rule is designed to prevent "judicial 'second-guessing' of . . . decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 814; accord In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008) ("The FTCA discretionary function exception is . . . a form of retained sovereign immunity.").

Here, Swarna's claim that Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function. Any failure to monitor employees was a systemic failure that occurred at the planning level of government. Indeed, the United States Department of State had requested the implementation of such monitoring in a memorandum dated May 20, 1996, addressing, inter alios, the Kuwait government. Even if Kuwait's failure to implement monitoring of its employees constitutes a tort in light of this prior notice, such failure to fulfill a regulatory function is not included in those acts which qualify under the tortious activity exception to Kuwait's sovereign immunity. See In re World Trade Ctr., 521 F.3d at 190.

Swarna's remaining claims, as to specific operational acts committed by individual employees at the Kuwait Mission, are essentially a restatement of her claim that Kuwait failed to adequately monitor its employees. And, in any event, her claim that the individual employees aided and abetted the individual defendants' tortious acts is not adequately pleaded. Swarna does not allege that she confronted these employees; she does not allege that these employees were aware of the State Department's memorandum of May 20, 1996; she does not identify these

31

employees; and she does not draw a plausible connection between the employees' acts and a coexisting awareness of the individual defendants' unlawful acts. See Bardere v. Zafir, 477 N.Y.S.2d 131, 134 (App. Div. 1984) ("Intentionally tortious conduct connotes conduct engaged in with the desire to bring about the consequences of the injurious act."); Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983) (explaining that "[l]iability [for severe emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (internal quotation marks omitted)); Beardsley v. Kilmer, 236 N.Y. 80, 89 (1923) (explaining that the motive which will make a lawful act unlawful must be a malicious one, unmixed with any other, and exclusively directed to the injury and damage of another); Dalton v. Union Bank of Switz., 520 N.Y.S.2d 764, 767 (N.Y. App. Div. 1987) ("In order to properly plead a cause of action for prima facie tort, it is necessary to allege that the action complained of was solely motivated by malice or 'disinterested malevolence.'" (citations omitted)). Moreover, even if these employees "aided and abetted" the tortious acts committed by the individual defendants, the employees would have only furthered activities that are unrelated to the diplomatic mission and arise from "personal motives" — which, as explained above, are non-imputable acts.

We therefore reject Swarna's claim that the tortious activity exception to sovereign immunity applies here.

2.      FSIA Commercial Activity Exception

As relevant in this appeal, the FSIA's commercial activity exception provides, in part, that a foreign state is not immune from suit in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). The term "commercial activity" is defined in the FSIA to mean "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of

32

an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The phrase "commercial activity carried on in the United States by a foreign state" is defined in the FSIA to mean a "commercial activity carried on by such state and having substantial contact with the United States." Id. § 1603(e); see also Saudi Arabia v. Nelson, 507 U.S. 349, 356 (1993) (stating that, for the commercial activity exception to apply, "the [plaintiff's] action must be 'based upon' some 'commercial activity' by [the foreign state] that had 'substantial contact' with the United States within the meaning of the Act").

In light of what the Supreme Court has called the "obtuse" statutory language of the commercial activity exception, the Court has further explained that a foreign state "engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." Saudi Arabia, 507 U.S. at 358, 360 ("[A] foreign state engages in commercial activity . . . only where it acts in the manner of a private player within the market." (internal quotation marks omitted)). Thus, to determine the applicability of the commercial activity exception, "we ask not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 177 (2d Cir. 2010) (internal quotation marks omitted)).

Here, Swarna argues that Kuwait cannot claim sovereign immunity because its diplomats, namely, the individual defendants, "engaged in a commercial activity by employing, paying, and supervising Swarna." Specifically, Swarna argues that her "contract-based claims, wage and hours claims, and tort claims under the ATCA" are "necessarily 'based on' the employment relationship between the Individual Defendants and Swarna" and that Kuwait is vicariously liable for the individual defendants' breach and wrongful acts. As explained above, however, Kuwait

33

cannot be held vicariously liable for the ATCA claims that Swarna makes against the individual defendants, *supra* note 10 and 11 and accompanying text. Moreover, to the extent Swarna asserts her state law claims, e.g., that the individual defendants breached their contract with her, this argument fails because the commercial activity exception specifically identifies the foreign state as the commercial actor. Compare 28 U.S.C. § 1605(a)(2) ("A foreign state shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . ."), with 28 U.S.C. § 1605(a)(5) ("A foreign state shall not be immune . . . in any case . . . for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . ."). Swarna has never been an employee of Kuwait. She was a servant to the individual defendants for their personal needs and was accordingly paid for by the individual defendants.[13] Any breach of contractual obligations in this case between Swarna and the individual defendants cannot support applying the commercial activity exception to Kuwait's sovereign immunity.

Accordingly, we reject Swarna's claim that the commercial activity exception applies to pierce Kuwait's sovereign immunity.

**III.    CONCLUSION**

For the foregoing reasons, the judgment of the District Court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

---

[13] Although Kuwait allegedly reimbursed the individual defendants for Swarna's dental care, this does not establish an employment relationship between Swarna and Kuwait. Moreover, Swarna's state law claims do not arise from any breach of agreement regarding reimbursement for her dental care. Rather, her state law claims are based on the individual defendants' private employment of her as a personal servant.