Lozano v. Alvarez

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: August 22, 2012                               Decided: October 1, 2012)

Docket No. 11-2224-cv
_____

MANUEL JOSE LOZANO,

*Petitioner-Appellant*,

—v.—

DIANA LUCIA MONTOYA ALVAREZ,

*Respondent-Appellee*.
_____

B e f o r e :

KATZMANN, WESLEY, AND LYNCH, *Circuit Judges.*

_____

Manuel Jose Lozano appeals from an April 29, 2011 order of the United States District Court for the Southern District of New York (Karas, *J.*), denying his Petition for Return of Child under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11611 (2005), in accordance with the Findings of Fact and Conclusions of Law stated on the record on April 28, 2011, the judgment issued on May 2, 2011, and the written opinion entered on August 22, 2011 further setting forth the district court's reasoning. We hold that while district courts retain discretion to order the return of a settled child to his or her country of habitual residency, the "now settled" defense available under Article 12 of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986), is not subject to equitable tolling. We further hold that when deciding whether a child is settled under Article 12, his or her lack of legal immigration status is not dispositive, but is one of several factors district courts should consider. Finally, we conclude that, in this case, the district court did not err in finding that the child was settled in the United States, and in declining to order her to be returned to the United Kingdom for custody proceedings. Accordingly, for the reasons stated below, the district court's decision denying Lozano's petition is **AFFIRMED**.

1

JOHN R. HEIN, New York, N.Y. (Shawn Patrick Regan, Amos R. Barclay (to be admitted), Kristin Kramer (to be admitted), New York, N.Y., Sharon M. Mills (to be admitted), Washington, D.C., Fran R. Aden, Houston, Tex., *on the brief*), Hunton & Williams LLP, *for Petitioner-Appellant*.

LAUREN A. MOSKOWITZ (Rachel G. Skaistis, *on the brief*), Cravath, Swaine & Moore LLP, New York, N.Y., *for Respondent-Appellee*.

ELLEN BLAIN, Assistant United State Attorney (Benjamin Torrance, Assistant United States Attorney, Geoffrey M. Klineberg, Counselor, Department of State, Harold Hongju Koh, Legal Adviser, Department of State, Mark B. Stern, Adam C. Jed, Attorneys, Appellate Staff, Civil Division, Department of Justice, Stuart F. Delery, Acting Assistant Attorney General), *for* Preet Bharara, United States Attorney for the Southern District of New York, *for Amicus Curiae United States of America*.

KATZMANN, *Circuit Judge*:

Two now-separated parents dispute whether courts in the United States or the United Kingdom should decide who has custody of their five-year-old child.[1] To resolve this case we must address two questions of first impression for this Court regarding the interpretation of Article 12 of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague Convention" or "Convention"): (1) whether the "now settled" defense[2] to the

---

[1] The subject child is referred to throughout the district court's decision and the Parties' filings as "the child" to protect her identity. In addition, pursuant to a confidentiality order entered by the Parties, with the district court's consent, information that could be used to identify the identity or location of the child, as well as privileged medical or mental health information, was withheld.

[2] As described further *infra*, the Hague Convention requires that a child wrongfully removed from a country be returned to that country in order to undergo a custody determination, unless the child is "now settled in its new environment." Convention, art. 12.

2

return of an abducted child is subject to equitable tolling; and (2) whether a child who lacks legal immigration status in the United States can nevertheless be found to be settled here within the meaning of the Convention. We hold that courts cannot equitably toll the one-year period before a parent can raise the now settled defense available under Article 12 of the Convention, and that when making a now settled determination, courts need not give controlling weight to a child's immigration status. We also consider and reject the petitioner's objections to the district court's (Karas, *J*.) findings of fact.

## BACKGROUND

A.    Factual Background

Diana Lucia Montoya Alvarez ("Alvarez") and Manuel Jose Lozano ("Lozano") (collectively, the "Parties"), who are both originally from Colombia, met and began dating in London in early 2004. *In re Lozano*, 809 F. Supp. 2d 197, 203 (S.D.N.Y. 2011). They never married. *Id*. at 203-04. The Parties' descriptions of their relationship differ. Lozano acknowledges that he and Alavarez had "normal couple problems," but claims that they were generally "very happy together." *Id*. at 204 (internal quotation marks omitted). In contrast, Alvarez asserts that Lozano"treat[ed] her badly." *Id*. She testified that, among other things, Lozano "tried to kick her in the stomach when she was pregnant, . . . called her a prostitute, and raped her four times." *Id*. Lozano denies all of these allegations. *Id*. The district court found that Lozano's claims that he never insulted or mistreated Alvarez in any manner were not credible, but also concluded that there was insufficient evidence from which to conclude that Lozano had physically or sexually abused either Alvarez or the child. *Id*. Accordingly, apart from finding that Lozano mistreated Alvarez in some way, the district court declined to make precise findings regarding what abuse occurred. *See id*.

3

From the child's birth on October 21, 2005, until November 19, 2008, Lozano, Alvarez, and the child lived together in London. *Id*. at 206-07. In October 2008, Alvarez spoke with the child's doctor regarding a host of concerns, including the child's silence at the nursery, frequent crying, nightmares, and bed-wetting. *Id*. The child's nursery manager also noted the child's unusual behavior and concluded that the "home 'environment obviously had a negative effect upon [her].'" *Id*. at 207. Based on the foregoing, the court found that the child had been exposed to, and negatively affected by, the problems in the couple's relationship. *Id*.

On November 19, 2008, shortly after visiting her sister Maria in New York, Alvarez "left [the couple's apartment] to bring the child to nursery school and never returned." *Id*. at 209. For the next seven months, Alvarez and the child resided at a women's shelter. *Id*. In early July of 2009, Alvarez and the child left the United Kingdom, eventually traveling to New York, where they have lived since that time. *Id.* at 210.

In New York, Alvarez and the child live with Alvarez's sister Maria, along with Maria's partner, daughter, and granddaughter. *Id*. at 211. Alvarez has not had a job in the United States, but Maria has been employed as a nanny for the same family for four years and her partner owns a grocery business. *Id*. "Because [Alvarez] and the child have British passports, they were allowed to enter the United States without a visa" for a stay of ninety days or less. *Id*. This period, however, expired in October 2009. *Id*. Alvarez testified that she has spoken with immigration authorities about the possibility of being sponsored by Maria, who is a United States citizen. *Id.* Since her arrival in New York, the child has attended the same school and, at the time of the proceedings before the district court, was enrolled in kindergarten. *Id*. The child's Academic Standards Reports from the 2009–2010 school year indicate that the child has

4

been making progress both socially and academically. *Id.* Outside of school, in addition to spending time with members of her extended family, the child has friends whom she meets at the park and the library. *Id.* The child is also enrolled in ballet classes and, on the weekends, attends church with Alvarez. *Id.* at 212.

After arriving in New York, both the child and Alvarez began receiving therapy from a psychiatric social worker at a family medical clinic. *Id.* The therapist testified that "when she first met the child, the child was unable to speak, make eye contact, or play in the therapist's office." The therapist further noted that the child "would wet herself, was hypervigilant, and had a very heightened startle response." *Id.* By February 2010, the therapist diagnosed the child with post-traumatic stress disorder ("PTSD") caused by her "experience living in the United Kingdom before coming to New York, including living in a shelter system, having to move to a new country, and knowing that her mother had been harmed or threatened." *Id.* Within six months of arriving in New York, however, Alvarez reported that the child's behavior had improved. *Id.* The therapist agreed with this assessment, describing the child as "'completely different.'" *Id.* In particular, the child had stopped bed-wetting, had made friends at school, was excited to play, and was able to speak freely regarding her feelings. *Id.*

After Lozano filed his petition for return in December 2010, Alvarez and the child resumed meeting with the therapist. *Id.* In a December 9, 2010 meeting, "the child 'stated that she was scared because her mommy seemed so worried.'" *Id.* (internal quotation marks omitted). The therapist's notes from a January 31, 2011 session indicate that when asked, out of Alvarez's presence, whether she wanted to see Lozano, the child responded "no." *Id.*

After Alvarez's departure, Lozano took a number of steps to attempt to find his child. Immediately after Alvarez left, he reached out to her sister in London, who denied any knowledge of Alvarez's whereabouts. *Id*. at 209. In the summer of 2009, Lozano filed an application with a British court to "ensure that he obtains regular contact with his child." *Id.* at 210 (brackets omitted). He also, via court filing, submitted orders to Alvarez's sisters and her former counsel, as well as the child's nursery and doctor and various police and government offices, seeking information on the child's whereabouts. *Id.* "After . . . 'exhaust[ing] all possibility that [the child] was still in the [United Kingdom],' on March 15, 2010, [Lozano] filed a Central Authority for England and Wales Application Form seeking to have the child returned to the United Kingdom."[3] *Id*. at 210. The application was sent to the United States Department of State Office of Children's Issues on March 23, 2010. *Id*.

B.     Proceedings Before the District Court

On November 10, 2010, Lozano filed a Petition for Return of Child (the "Petition") pursuant to Article 2 of the Hague Convention and the International Child Abduction Remedies Act, 42 U.S.C. § 11603 (2005) ("ICARA"), in the United States District Court for the Southern District of New York, requesting an order requiring that the child be returned to London to have a British court make a custody determination. *Id*. at 202. Accompanying the Petition was an Emergency Petition for Warrant in Lieu of Writ of *Habeas Corpus* ("Emergency Petition").

---

[3]Article 6 of the Convention specifies that each "Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." These duties include "discover[ing] the whereabouts of a child who has been wrongfully removed or retained" and "initiat[ing] or facilitat[ing] the institution of judicial or administrative proceedings with a view to obtaining the return of the child." Convention, art. 7(a), (f).

6

Both parties subsequently retained experts to examine the child and determine whether returning the child to the United Kingdom would pose a risk of causing her psychological harm. Alvarez's expert, Dr. B.J. Cling, concluded that "the child was 'potentially at risk'" of "'another psychological breakdown'" if she "were to be forcibly returned to the [United Kingdom] for custody evaluation." *Id*. at 214. Lozano's expert, Dr. Michael Fraser, concluded that the child was at an "'increased risk for some degree of psychological maladjustment if she is required to move again; but the potential negative effects depend on many factors.'" *Id*. at 216.

The Court held an evidentiary hearing on February 2 and 3, 2011, at which it admitted both parties' proffered expert reports, received exhibits into evidence, and heard testimony from Lozano, Alvarez, the therapist, Dr. Cling, and Dr. Fraser. *Id*.

On February 18, 2011, the Parties submitted post-trial memoranda of law upon which oral argument was held on April 28, 2011. *Id*. At the end of oral argument, after reciting its findings of fact and conclusions of law, the court denied Lozano's Petition. *Id*. The next day, the court issued an order dismissing the Petition and entering judgment for Alvarez. *Id*. On August 22, 2011, the court filed a written opinion further setting forth its reasoning.

In a thorough opinion, the district court first held that Lozano had made out a *prima facie* case of wrongful retention under the Hague Convention because: (1) the child was a habitual resident of the United Kingdom; (2) Alvarez's unlawful removal of the child breached Lozano's custody rights under English law; and (3) Lozano exercised parental rights at the time the child was removed. Accordingly, the court noted that the child must be returned to the United Kingdom *unless* Alvarez established an affirmative defense. *Id*. at 219-20. Before the district court, Alvarez raised two of the affirmative defenses available under the Convention. On appeal,

7

however, only the now settled defense is at issue.[4]  With regard to Alvarez's raising of the now

settled affirmative defense, Lozano noted that this defense is unavailable until "one year has

elapsed from the date of the [child's] wrongful removal or retention," Convention, art. 12, and

argued that the one-year period should be tolled until the time Lozano reasonably could have

learned of his child's whereabouts.  *Lozano*, 809 F. Supp. 2d at 226.  The district court

disagreed, concluding that the

> one-year period is not a statute of limitations and, therefore, it is not subject to
> equitable tolling.  A petitioner is not barred from bringing a petition after the one-
> year period has lapsed; rather, after that point, a court must consider the
> countervailing consideration that the child may now be better served remaining
> where he or she is currently located.

*Id*. at 228.  Citing the Convention's text, history and purpose, the district court found that the

"settled defense is not [intended] to give petitioners a reasonable amount of time in which to

bring their claims," but "to take into account that if the child has become settled, its interests

have to be weighed."  *Id*.  As an alternative basis for its decision, the district court held that

"even if equitable tolling could apply to Convention petitions," it was not "warranted in this

case."  *Id.* at 229.

Having rejected Lozano's tolling argument, the district court next held that the now

settled defense applied and was a sufficient reason to have a United States court, as opposed to

an English court, decide the child's custody.  *Id*. at 234.  The district court engaged in a detailed

---

[4]The district court rejected Alvarez's second defense – that "there is a grave risk" that the child's return to the United Kingdom "would expose [her] to physical or psychological harm or otherwise place the child in an intolerable situation."  *Id*. at 220 (quoting Hague Convention art. 13(b)).  Specifically, the court found that there was "simply insufficient evidence that merely returning to the United Kingdom – even if the country was the site of some of the child's trauma, whether caused by the child witnessing Petitioner's abuse of Respondent or by being in the shelter – in and of itself would present a grave risk" to the child.  *Id*. at 225.

8

analysis of various factors that weighed both for and against the child remaining in the United States for further proceedings, including that: (1) the child has been in the same location for the duration of her time in the United States; (2) the child has shown social and academic progress; (3) Alvarez appropriately cares for the child; (4) Alvarez is unemployed; (5) the child is too young to form certain types of connections; and (6) both Alvarez and the child have overstayed their visas and thus are not legally residing in the United States. *Id*. at 231-34. With respect to the final factor, Judge Karas rejected Lozano's argument that the child could not be settled (as a matter of law) so long as she lacked lawful immigration status. Instead, he stressed that "[t]here is nothing to suggest that, at this moment, or in the near future, the immigration status of the child and Respondent is likely to upset the stability of the child's life here in New York." *Id*. at 233.

Finally, the district court considered whether to exercise its discretion to order repatriation despite its finding that the child is settled in New York. *Id*. at 234-35. Judge Karas declined to do so, focusing largely on the "specific impact of returning to the United Kingdom on this particular child" who "[b]y all accounts . . . is much improved since arriving in the United States, but . . . is clearly more vulnerable than an average five-year-old child who has never experienced trauma." *Id*. at 234.

On May 27, 2011, Lozano filed a timely notice of appeal from the district court's denial of his petition.

C.    The Government's Brief as *Amicus Curiae*

By letter dated July 11, 2012, this Court notified the United States Department of State (the "Department") that oral argument in this case was scheduled to take place on August 22,

2012, and requested that the Secretary of State submit her views concerning: (1) whether the one-year period before a party can raise the "now settled" defense in Article 12 of the Convention is susceptible to equitable tolling; and (2) what significance should be given to a child's lack of legal immigration status in the United States when determining whether a child is settled within the meaning of Article 12.

On August 20, 2012, the United States submitted a memorandum brief as *amicus curiae* recommending that this Court find, in pertinent part, that:

> (1) Equitable tolling does not apply to the one-year period under Article 12; instead, the court retains equitable discretion to order a child's return at any time. A court may do so even if the child is 'now settled.' . . . [And,] (2) [t]he child's immigration status should not be dispositive standing alone, but may be one factor in a court's determination of whether the child is now settled in her new environment.

*Amicus* Br. at 2.

## DISCUSSION

On appeal, Lozano raises three principal objections to the district court's decision. First, he argues that, as a matter of law, the district court erred in permitting Alvarez to raise the now settled defense because the one-year period in Article 12 should have been equitably tolled until such time as he could have reasonably located his child. Second, Lozano contends that the district court erred in finding that the child is settled in New York despite the fact that neither the child nor her mother have legal status in the United States. Finally, even if lack of legal immigration status "does not preclude a well-settled finding as a matter of law," Lozano avers that "the District Court erred in finding that Alvarez proved by a preponderance of the evidence that the parties' daughter is well-settled in the United States." Pet'r's Br. at 46. Specifically, Lozano takes issue with the district court's factual finding that there is "stability in [the child's]

10

family, educational, social, and most importantly, home life." *Id*. at 51 (internal quotation marks omitted). After stating the applicable standards of review and the relevant law of treaty interpretation, we address each of Lozano's arguments in turn.

## I. Standard of Review

"In cases arising under the Convention and ICARA, we review a district court's factual determinations for clear error." *Mota v. Castillo*, -- F.3d --, 2012 WL 3330176, at *3 (2d Cir. Aug. 15, 2012). Interpretation of the Convention, however, is an issue of law, which we review *de novo*. *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) ("*Blondin IV*"). We also review *de novo* "the district court's *application* of the Convention to the facts it has found." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (internal quotation marks and brackets omitted).[5]

## II. Law of Treaty Interpretation

"In interpreting a treaty, it is well established that we begin with the text of the treaty and the context in which the written words are used." *Swarna v. Al-Awadi*, 622 F.3d 123, 132 (2d

---

[5] In *Blondin IV*, this Court relied on precedent from the Third and Ninth Circuits to hold that the "*application* of the Convention to the facts . . . like the *interpretation* of the Convention, is subject to *de novo* review." 238 F.3d at 158 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995) and *Cree v. Flores*, 157 F.3d 762, 768 (9th Cir. 1998)). In at least two additional opinions, we have confirmed that a *de novo* standard of review applies to an appeal from a district court's application of the Convention. *See, e.g., Mota*, 2012 WL 3330176, at *3; *Gitter*, 396 F.3d 124.

We think an abuse of discretion standard might be more apt where, as here, the treaty provision being applied requires the district court to engage in an equitable balancing of a multitude of factors. *Cf. Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003) (holding that this Court will review for abuse of discretion a district court's decision to deny a plaintiff's request for equitable tolling of a filing deadline). It is, however, unnecessary for us to decide this issue because, apart from Lozano's purely legal arguments that the one-year period in Article 12 is subject to equitable tolling and that lack of valid immigration status precludes a settled finding, Lozano challenges only the factual findings underpinning the district court's decision. These we review only for clear error.

Cir. 2010) (internal quotation marks omitted). "The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) (internal quotation marks omitted). "General rules of statutory construction may be brought to bear on difficult or ambiguous passages, but we also look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the signatory parties in determining the meaning of a treaty provision." *Swarna*, 622 F.3d at 132 (internal quotation marks and brackets omitted); *Medellín v. Texas*, 552 U.S. 491, 507 (2008) ("Because a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the . . . postratification understanding of signatory nations." (internal quotation marks omitted)). Additionally, "while the interpretation of a treaty is a question of law for the courts, given the nature of the document and the unique relationships it implicates, the 'Executive Branch's interpretation of a treaty is entitled to great weight." *Swarna*, 622 F.3d at 133 (quoting *Abbott v. Abbott*, 130 S. Ct. 1983, 1992 (2010)).

III.     Courts cannot equitably toll the one-year period before a parent can assert the now settled defense.

Lozano argues that the district court "should have applied equitable principles to toll the commencement of Article 12's one-year filing period until the date [Lozano] reasonably could determine that [Alvarez] had removed their daughter from the United Kingdom to the United States." Pet'r's Br. at 15.[6] Alvarez counters that the district court properly found that the one-

_____

   [6] In particular, Lozano contends that the one-year period should not have commenced until February 22, 2010, the date when he received the final responses to the orders of disclosure regarding his daughter's whereabouts. Pet'r's Br. at 18.

12

year period in Article 12 is not subject to equitable tolling. Resp't's Br. at 23-33. We agree with the district court and hold that while an abducting parent's conduct may be taken into account when deciding whether a child is settled in his or her new environment, the one-year period set out in Article 12 is not subject to equitable tolling.

A.    *The Text of the Convention*

Neither Article 12 of the Hague Convention nor its implementing legislation, ICARA,[7] explicitly permit or prohibit tolling of the one-year period before a parent can raise the now settled defense.[8] Article 12 provides, in relevant part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement[9] of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

---

[7] The ICARA specifies that "[i]n the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing – . . . (B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies." 42 U.S.C. § 11603(e)(2)(B).

[8] While the text of the Convention does not explicitly address the issue, we note that the text does provide one clue that tolling was not anticipated. The language of Article 12 expressly starts the running of the one-year period "from the date of the wrongful removal or retention." It would have been a simple matter, if the state parties to the Convention wished to take account of the possibility that an abducting parent might make it difficult for the petitioning parent to discover the child's whereabouts, to run the period "from the date that the petitioning parent learned [or, could reasonably have learned] of the child's whereabouts." But the drafters did not adopt such language. As discussed below, the drafting history demonstrates that this was a conscious choice, and that the drafters specifically rejected a proposal to have a different date trigger the start of the one-year period when the child's whereabouts had been concealed. *See infra* at 17-18.

[9] The ICARA provides that "the 'commencement of proceedings,' as used in Article 12 of the Convention," does not occur until a person files a petition in a civil action for the return of the child in a court that has jurisdiction in the place where the child is located at the time the petition is filed. 42 U.S.C. §§ 11603(b), (f)(3).

13

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the proceeding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

*Id.* Accordingly, the default presumption under the Convention is that a child *shall* be returned to the state from which she originally was wrongfully removed *unless* both of two conditions are met: (1) one year has elapsed between the date of wrongful removal and the date proceedings commence; and (2) the child is found to be "now settled in its new environment." *Id.*

Even if these two conditions are met, Article 12 does not bar the Central Authority of a Contracting State from ordering the return of a settled child. As we explained in *Blondin IV*, Article 12 allows – "but does not . . . require – a judicial or administrative authority to refuse to order the repatriation of a child on the *sole* ground that the child is settled in its new environment, *if* more than one year has elapsed between the abduction and the petition for return." 238 F.3d at 164. Put differently, "if more than one year has passed, a 'demonstra[tion] that the child is now settled in its new environment' may be a *sufficient* ground for refusing to order repatriation." *Id.*[10] Thus, while the text of Article 12 does not prohibit equitable tolling, the way the provision functions renders this sort of equitable relief unnecessary. Unlike a statute of limitations prohibiting a parent from filing a return petition after a year has expired, the settled defense merely permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency. *See Lozano*, 809 F. Supp. 2d at 227-28 (reasoning that the one-year period in

---

[10] This interpretation of Article 12 is further bolstered by Article 18, which provides that none of the provisions in the Convention "limit the power of a judicial or administrative authority to order the return of the child at any time." Convention, art. 18.

Article 12 is not analogous to a statute of limitations); *Matovski v. Matovski*, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *12 (S.D.N.Y. Aug. 31, 2007) (same); *Anderson v. Acree*, 250 F. Supp. 2d 872, 875 (S.D. Ohio 2002) (same); *Toren v. Toren*, 26 F. Supp. 2d 240, 244 (D. Mass. 1998) (same), *vacated on other grounds*, 191 F.3d 23 (1st Cir. 1999).

       B.      *The History and Purpose of the Article 12 Now Settled Exception*

Tolling the time before a parent can raise the settled defense is also inconsistent with the treaty's purpose. A report prepared by the official Hague Conference reporter for the Convention, Elisa Pérez-Vera,[11] provides an overview of the Convention's goals and a detailed analysis of each of its provisions. Elisa Pérez-Vera, *Explanatory Report*, in 3 Conférence de la Haye de droit international privé, Actes et Documents de la Quatorzième session, Enlèvement d'enfants 426 (1982) ("Pérez-Vera Report"), available at www.hcch.net/upload/expl28.pdf. Both the Convention's text and the Pérez-Vera Report state that the treaty's primary aim is to deter family members from removing children to jurisdictions more favorable to their custody claims in order "to obtain a right of custody from the authorities of the country to which the child has been taken." Pérez-Vera Report at 429 ¶ 13; Convention, art. 1 ("The objects of the present Convention are – (a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of

_____

[11] Elisa Pérez-Vera was "the official Hague Conference reporter for the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,503. "Her explanatory report [was] recognized by the Conference as the official history and commentary on the Convention," *id.*, and we have previously held that "it is an authoritative source for interpreting the Convention's provisions," *Croll v. Croll*, 229 F.3d 133, 137 n.3 (2d Cir. 2000) (citation omitted), abrogated on other grounds by *Abbott*, 130 S. Ct. 1983; *see also Gitter*, 396 F.3d at 129 & n.4.

15

one Contracting State are effectively respected in the other Contracting States."). To that end, the Convention "places at the head of its objectives the restoration of the *status quo*, by means of 'the prompt return of children wrongfully removed to or retained in any Contracting state.'" *Id*. at ¶ 16.

It is true that nothing in the text of the "dispositive part of the Convention . . . reference[s] . . . the interests of the child to the extent of their qualifying the Convention's stated object." *Id*. at 431 ¶ 23. But the Pérez-Vera Report cautions against construing the Convention's "silence on this point" as "lead[ing] one to the conclusion that the Convention" suggests that children's interests should be "ignore[d]" when "regulating all the problems which concern them." *Id*. Instead, the Pérez-Vera Report states that a concern for children's "true interests" was the primary reason the signatory states "drew up the Convention." *Id*. ¶¶ 23-24; *see also Blondin IV*, 238 F.3d at 161 (noting that while the Hague Convention is not "designed to resolve underlying custody disputes," "[t]his fact . . . does not render irrelevant any countervailing interests the child might have."). Simply put, the Convention is not intended to promote the return of a child to his or her country of habitual residency irrespective of that child's best interests; rather, the Convention embodies the judgment that *in most instances*, a child's welfare is best served by a prompt return to that country. The signatory states, however, were aware that there are situations where "the removal of the child can . . . be justified by objective reasons which have to do either with [the child's] person, or with the environment with which [the child] is most closely connected." Pérez-Vera Report at 432 ¶ 25. Accordingly, the Convention "recognizes the need for certain exceptions" to the signatory states' "general obligation[] . . . to secure the prompt return of children who have been unlawfully removed or

16

retained." *Id.* Pérez-Vera describes these "exceptions" as "concrete illustrations of the overly vague principle whereby the interests of the child are stated to be the guiding criterion in this area." *Id.*; *see also Blondin IV*, 238 F.3d at 164 (noting that the Convention's drafters recognized that, despite the general aim of "ensur[ing] the return of abducted children," there "could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." (internal quotation marks and citations omitted)).

The Convention constrains Central Authorities' discretion to decline to order a child's return to his or her country of habitual residency when return would not be in that child's best interests. Article 12 establishes that a Central Authority cannot even consider the child's interest in remaining in the country to which she has been abducted until after a year has elapsed. *See* Pérez-Vera Report at 458 ¶ 107 ("In the first paragraph [of Article 12], the article brings a unique solution to bear upon the problem of determining the period during which the authorities concerned must order the return of the child forthwith."); *Amicus* Br. at 9 ("As described by the United States, the Convention thus provided for a one-year period in which 'no assimilation of the child was presumed to have occurred' and 'return could be refused only on the grounds set forth' expressly, *e.g.* severe risk to the child. After this initial one-year period, 'assimilation became an open question.'" (internal citation omitted)).

The Pérez-Vera Report acknowledges that the one-year period set forth in Article 12 is somewhat "arbitrary." *Id.* ("[T]he difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard."). However, the drafters of the Convention saw value in agreeing to a

17

"single time-limit of one year" and setting aside "the difficulties encountered in establishing the child's whereabouts." *Id*. at ¶ 108. Indeed, the drafters considered and rejected an alternative proposal: A preliminary draft of the Convention included two time-periods in Article 12, depending on whether the child had been hidden. Merle H. Weiner, *Uprooting Children in the Name of Equity*, 33 Fordham Int'l L.J. 409, 434 (2010). The Pérez-Vera Report explains that the framers jettisoned this approach to eliminate "the inherent difficulty in having to prove the existence of those problems which can surround the locating of [a] child." Pérez-Vera Report at 459 ¶ 108.[12]

In sum, the Convention's drafting history strongly supports Alvarez's position that the one-year period in Article 12 was designed to allow courts to take into account a child's interest in remaining in the country to which she has been abducted after a certain amount of time has passed. If this understanding of the second paragraph of Article 12 is correct, allowing equitable tolling of the one-year period would undermine its purpose. A child may develop an interest in remaining in a country in which she has lived for a substantial amount of time regardless of her parents' efforts to conceal or locate her.

    C.    *The Executive Branch's Interpretation of Article 12*

As noted, courts give "great weight" to the "Executive Branch's interpretation of a treaty" given "the nature of the document and the unique relationships it implicates." *See Swarna*, 622 F.3d at 133. Moreover, while the Convention is not a statute that the Department is

---

[12] The Government's brief notes that after the drafters had settled on a single time-limit, the United States "urged a longer period in light of the difficulty of locating the child . . . a suggestion that presupposes that the single period would not toll at least for that reason." *Amicus* Br. at 9 (internal citation omitted).

charged with implementing, it has played a critical role in its adoption and day-to-day operation.[13] Accordingly, deference to the Department's interpretation of the treaty is warranted to the extent it is persuasive. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Here, we derive further support for our interpretation of the Convention from the Department's well-reasoned and thorough interpretation of Article 12*,* as presented in the Government's *amicus* brief. Employing an interpretive process entirely in line with our own, the Government reached the same conclusion, that is, that "tolling does not apply to the one-year period under Article 12." *Amicus* Br. at 2, 6-11.[14]

---

[13] In its *amicus* brief, the Government states that

> The Department of State represented the United States at the negotiation of the Convention, recommended that the President transmit it to the Senate for approval, was instrumental in proposing its implementing legislation to Congress, has attended periodic international meetings to review the operation of the Convention, and is designated pursuant to the Convention as the United States' "Central Authority," with responsibility for cooperating with its counterparts in other states parties to " secure the prompt return of children and to achieve the other objects of the Convention."

*Amicus* Br. at 2 n.1 (quoting Convention, arts. 6,7); *see also* 22 C.F.R. § 94.2 (designating the "Office of Children's Issues in the Bureau of Consular Affairs . . . as the U.S. Central Authority to discharge the duties which are imposed by the Convention and the International Child Abduction Remedies Act upon such authorities.").

[14] The Government's *amicus* brief in this case is not the first occasion on which the Department has considered whether the Convention permits equitable tolling of the one-year period in Article 12. *See Skidmore*, 323 U.S. at 140 (the weight to be accorded an agency's judgment "in a particular case will depend upon," *inter alia*, "its consistency with earlier and later pronouncement"). In its "Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction," 51 Fed. Reg. 10,503 (1986) ("*Legal Analysis*"), the Department opined that "[t]he reason for the passage of time, which may have made it possible for the child to form ties to the new country, is . . . relevant to the ultimate disposition of the return petition." More recently, in response to a 2006 questionnaire on the practical operation of the Convention, the Department noted that certain United States courts have equitably tolled the one-year period in Article 12 and, expressed its support for "the concept of equitable tolling of the one year filing

19

D.   *Decisions of Our Sister Circuits*

At least three of our sister Circuits have permitted the one-year period in Article 12 to be equitably tolled.  *See Dietz v. Dietz*, 349 F. App'x 930, 932-33 (5th Cir. 2009) (summary order); *Duarte v. Bardales*, 526 F.3d 563, 569-70 (9th Cir. 2009 ); *Furnes v. Reeves*, 362 F.3d 702, 723-24 (11th Cir. 2004 ).   In particular, the Eleventh Circuit held in *Furnes* that equitable tolling is justified where a parent secrets the child from the parent seeking return because:  (1) otherwise, a "parent who abducts and conceals [a child] for more than one year will be rewarded for the misconduct by creating eligibility for an affirmative defense not otherwise available"; and (2) "[u]nless Congress states otherwise, equitable tolling should be read into every statute of

------

deadline in order to prevent creating an incentive for a taking parent to conceal the whereabouts of a child from the other parent in order to prevent the timely filing of a Hague petition."  Hague Convention on Private International Law, "Collated Responses to the Questionnaire Concerning the Practical Operation of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction," Prel. Doc. No. 2 of October 2006, at 217, 577, available at http://www.hcch.net/upload/wop/abd_pd02efs2006.pdf ("*Questionnaire Responses*").

The Department's position as articulated in the Government's *amicus* brief is not inconsistent with these prior statements.  As early as 1986, the Department maintained that courts may consider whether an abducting parent has concealed the child's whereabouts when deciding whether to grant a return petition. *Legal Analysis*, 51 Fed. Reg. 10,503.  It has never, however, taken the position that courts should be precluded from considering whether a child is settled exclusively because of a parent's wrongful conduct.  Indeed, in response to the 2006 questionnaire on the Convention's practical operation, the Department noted that some United States courts had equitably tolled the one-year period in Article 12, but only endorsed the concept that courts should consider whether denying a return petition will create an incentive for a parent to conceal his child's location. *Questionnaire Responses*, 577.  This statement fully aligns with the Department's position in this case, that

> equitable tolling, in the traditional sense, of Article 12's one-year period to preclude consideration of the child's settlement is not warranted.  But the court considering a petition filed more than a year after the child's wrongful removal may still exercise equitable discretion to require the child's return.

*Amicus* Br. at 13.

20

limitations." 362 F.3d at 723-24 (internal quotation marks omitted). As for the first argument, the Convention expressly provides a mechanism other than equitable tolling to avoid rewarding a parent's misconduct – a Central Authority's discretion to order the return of a child, even when a defense is satisfied. *See Blondin v. Dubois*, 189 F.3d 240, 246 n.4 (2d Cir. 1999) ("[E]ven where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent."). The second argument is also unpersuasive as it wrongly treats the one-year period in Article 12 as a statute of limitations.[13]

IV. Lack of legal immigration status does not preclude a court from finding a child to be settled.

Having determined that the district court properly permitted Alvarez to raise the Article 12 now settled defense, we must consider whether the district court erred in finding the child to be settled in New York. On appeal, Lozano primarily asserts that "[w]here an abducted child resides in the abducted-to country illegally, a well-settled finding should be barred as a matter of law." Pet'r's Br. at 36. We disagree. Given the Convention's text and purpose, immigration status should only be one of many factors courts take into account when deciding if a child is

---

[13] The Ninth Circuit's decision in *Duarte* relies mainly on the Eleventh Circuit's faulty reasoning in *Furnes*. *See* 526 F.3d at 569-70. Moreover, a subsequent Ninth Circuit decision – *In re B. DEL C.S.B.*, 559 F.3d 999 (9thCir. 2009) – suggests that there may be limits to the *Duarte* holding. *Id.* at 1014 ("Given that equitable tolling may permit the return of children otherwise settled in their new environment, we adhere closely to the parameters set by *Duarte* so as to ensure that the Convention's concern over uprooting children is not sacrificed to its aim of deterring child abductions."). Further, in *Dietz*, the Fifth Circuit assumed that it could equitably toll the one-year period without offering any legal basis for its view, likely because the respondent did not challenge it. 349 F. App'x at 933 ("[Respondent] does not attack the use of equitable tolling as such. Indeed, he does not appear to question the court's application of tolling to the summer of 2006."). Accordingly, the Fifth Circuit's decision holds limited persuasive power.

21

settled within the meaning of Article 12. Additionally, we hold that, in any given case, the weight to be ascribed to a child's immigration status will necessarily vary.

Neither the Convention nor ICARA defines "settled" or states how a child's settlement is to be proved. *See* Pérez-Vera Report at 459 ¶ 109. Where a term is undefined in a statute, "we normally construe it accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). In this regard, the use of the term settled suggests a stable and permanent relocation of the child. *See* Merriam-Webster Dictionary, www.merriam-webster.com/dictionary /settled (last visited September 26, 2012) (defining "settled" as "to establish or secure permanently"); Dictionary.com, www.dictionary.reference.com/browse/settled?s=t (last visited September 26, 2012) (defining "settled" as "to make stable; place in a permanent position or on a permanent basis").

Statutory terms are also to be interpreted in light of their "placement and purpose in the statutory scheme." *Holloway v. United States,* 526 U.S. 1,6 (1999). Although one of the primary objectives of the Convention is to ensure the "prompt return" of abducted children without reaching the merits of underlying custody disputes, *see* Hague Convention, art. 1, the settled exception recognizes that there may come a point at which "repatriation might not be in [the child's] best interest." *Blondin IV*, 238 F.3d at 164. The Explanatory Report provides that exceptions to the return of the child, such as Article 12, "are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter" and that "a systematic invocation of [the] exceptions . . . would lead to the collapse of the whole structure of the Convention." Pérez-Vera Report at 434-35 ¶ 34. To this end, the State Department concluded that to be "settled" requires "nothing less than substantial evidence of the child's significant connections to the new country." *Legal Analysis*, 51 Fed. Reg, at 10,509 (1986).

22

In light of these considerations, "settled" should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment. *See, e.g., In re N.*, [1990] 1 FLR 413 (Eng. High Court of Justice, Fam. Div.), *available at* www.hcch.net/incadat/fullcase/0106.htm. In making this determination, "a court may consider any factor relevant to a child's connection to his living arrangement." *Duarte,* 526 F.3d at 576. Such an approach is in line with the Convention's overarching focus on a child's practical well-being. Factors that courts consider should generally include:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Duarte*, 526 F.3d at 576; *see also Matovski*, 2007 WL 2600862, at *13 (same); *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 (JG), 2005 WL 67094, at *8 (E.D.N.Y. Jan. 13, 2005) (same); *Koc v. Koc*, 181 F. Supp. 2d 136, 152-54 (E.D.N.Y. 2001) (same). Even as Lozano advocates a categorical rule or strong presumption that lack of lawful immigration status bars a settled finding as a matter of law, he acknowledges that to determine whether a child is settled in his new environment, courts are "permitted to consider any relevant factor surrounding the child's living arrangement – without limitation." Pet'r's Br. at 42 (internal quotation marks omitted). While courts have consistently found immigration status to be a factor when deciding whether a child is settled, no court has held it to be singularly dispositive.[14] Indeed, the fact-specific multi-

_____

[14] Lozano claims that his position has been adopted by the "majority" of those courts that have considered it. Pet'r's Br. at 37. This assertion is incorrect. District courts across the country have taken into account a child's immigration status when deciding if she is well-settled. *See, e.g., In re Hague Convention*, No. 08-2030-CM, 2008 WL 913325, at *11 (D. Kan. Mar. 17, 2008); *In re Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004). However, only one court of appeals – the Ninth Circuit – has directly addressed "whether a court may find that a child is not

23

factor test that we formally adopt is consistent with the Government's understanding of Article 12 as expressed in its *amicus* brief. *See Amicus* Br. at 13-15.[15]

Retreating from his initial position that lack of legal immigration status altogether bars a settled finding under Article 12, Lozano next argues that the district court failed to give the child's undocumented status adequate weight. Pet'r's Br. at 46. In particular, Lozano contends that the district court erred because it discounted the significance of the child's lack of immigration status once it found that the child did not face an immediate threat of deportation. *Id.* For example, a child might be ineligible for certain government-conferred benefits. We are not persuaded. The importance of a child's immigration status will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits. Moreover, rather than considering the weight to be given to a child's immigration status in the abstract, courts deciding whether a child is settled must simultaneously balance many factors which, as in this case, may not support the same determination.[16]

---

'settled' for the purposes of Article 12 of the Hague Convention for the reason that she does not have lawful immigration status." *In re B. Del C.S.B.*, 559 F.3d at 1001-02. And, in that case, the Ninth Circuit concluded that "the answer is no." *Id*. at 1002.

[15] Citing cases from Canada and the United Kingdom, the Government's brief also notes that "[f]oreign courts have given varying weight to immigration status, depending on the circumstances of the case." *Amicus* Br. at 14.

[16] The Ninth Circuit has held that because the settled inquiry is "concerned with the *present*, and not with determining the bests interest of the child in the long term," a child's immigration status should only be relevant to the settled analysis to the extent that there is an "imminent threat of removal." 559 F.3d 1013-14. We agree with the Ninth Circuit's observation that the now settled analysis should not be conflated with the custody determination which will follow. *See* Pérez-Vera Report 429 ¶13 (noting that Convention's purpose is not to decide custody but to "deprive" an abductor's actions of "practical or juridical consequences").

Here, the district court's analysis was largely compatible with the approach we prescribe. After noting the array of factors that are relevant to a settled determination, the district court observed that "a number of these factors support a finding that the child is now settled, and there are some that do not." 809 F. Supp. 2d at 231. The court then examined these factors – including the child's immigration status – both independently and in relation to each other. *Id*. at 231-34. The district court expressly referenced that the child and Alvarez had overstayed their visas, but observed that there is "nothing to suggest that, at this moment, or in the near future, the immigration status of the child and [Alvarez] is likely to upset the *stability* of the child's life here in New York." *Id*. at 233 (emphasis added). Given the child's psychiatric history and documented "fragility," the district court's focus on "stability" in the near future seems particularly appropriate.[17] Even on *de novo* review, we are not inclined to upset the district court's careful balancing of these many fact-based considerations.

V.      The district court's factual findings were not clearly erroneous.

Finally, Lozano contends that the district court's finding are not backed by a preponderance of the evidence because "most of the evidence on the well-settled issue should not be given much weight because it came from [Alvarez's] own self-interested hearsay testimony, and to a lesser extent, from the therapist and child's school records." Pet'r's Br. at 49-50. Relatedly, Lozano claims that Alvarez should have provided "corroborating testimony . .

However, because we can imagine instances where immigration status may be important even if the threat of removal is negligible, we decline to impose a categorical rule that the weight to be given a child's immigration status varies only in accordance with the threat of deportation.

     [17] At oral argument, Lozano's attorney acknowledged that he had not brought to the district court's attention the ways in which the child's lack of legal immigration status could affect her life in the long-term. Accordingly, we see no error in the district court's failure to consider them.

. and other evidence of the child's connections to her new environment." *Id*. at 51. These arguments can be swiftly rejected.

The district court conducted a two-day hearing, after which it made factual findings with respect to each of the now settled factors. At the hearing, Judge Karas not only reviewed a significant amount of evidence but also had the opportunity to observe the Parties' demeanor and assess their credibility. Far from glossing over inconsistencies in the evidence, the district court fully engaged with all of the information that had been presented to it before announcing its determinations. None of Lozano's challenges to these findings leave us with a "definite and firm conviction that a mistake has been committed." *United States v. Kilkenny*, 493 F.3d 122, 125 (2d Cir. 2007) (internal quotation marks omitted)

## CONCLUSION

We have considered Lozano's remaining arguments and conclude that they are without merit. For the foregoing reasons we **AFFIRM** the district court's May 2, 2011 judgment.

26